IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, *ex rel*. KATHLEEN JENNINGS, Attorney General of the State of Delaware,<br><br>    Plaintiff Below,<br>    Appellant,<br><br>v.<br><br>MONSANTO COMPANY, SOLUTIA, INC., and PHARMACIA LLC,<br><br>    Defendants Below,<br>    Appellees. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 279, 2022<br><br>Court Below: Superior Court of the State of Delaware<br><br>C.A. No. N21C-09-179 |

Submitted: March 29, 2023
Decided:    June 22, 2023

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN** and **TRAYNOR**, Justices; **MCCORMICK**, Chancellor,[1] constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED IN PART AND REVERSED IN PART**.

Ralph K. Durstein III, Esquire (*argued*), Christian Douglas Wright, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware; Alison S. Gaffney, Esquire, Daniel Mensher, Esquire, KELLER ROHRBACK L.L.P., Seattle, Washington; Keil Mueller, Esquire, Steven C. Berman, Esquire, STOLL STOLL BERNE LOKTING & SHLACHTER P.C., Portland, Oregon, *for Plaintiff Below, Appellant State of Delaware*.

Christian J. Singewald, Esquire, Timothy S. Martin, Esquire, Daryll Hawthorne-Searight, Esquire, WHITE AND WILLIAMS LLP, Wilmington, Delaware; Kim

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

Kocher, Esquire (*argued*), Thomas M. Goutman, Esquire, David S. Haase, Esquire, SHOOK, HARDY & BACON L.L.P., Philadelphia, Pennsylvania, *for Defendants Below, Appellees Monsanto Company, Solutia, Inc., and Pharmacia LLC*.

Kenneth T. Kristl, Esquire, WIDENER UNIVERSITY DELAWARE LAW SCHOOL, Wilmington, Delaware *as Amici Curiae Legal Scholars, in support of Appellant*.

Richard L. Renck, Esquire, Mackenzie Wrobel, Esquire, Michael Gonen, Esquire, DUANE MORRIS LLP, Wilmington, Delaware; Robert M. Palumbos, Esquire, DUANE MORRIS LLP, Philadelphia, Pennsylvania; Jonathan Urick, Esquire, U.S. CHAMBERS OF COMMERCE, Washington, D.C., *as Amici Curiae the Chamber of Commerce of the United States of America, the American Tort Reform Association, and the American Coatings Association in support of Appellees*.

Anne M. Steadman, Esquire, REED SMITH LLP, Wilmington, Delaware; James C. Martin, Esquire, REED SMITH LLP, Pittsburgh, Pennsylvania, *as Amicus Curiae The Product Liability Advisory Council in support of Appellee*.

**SEITZ**, Chief Justice:

According to the allegations of the complaint, for over forty years, Monsanto was the only U.S. manufacturer of polychlorinated biphenyls, or "PCBs." PCBs are forever chemicals that, when released into the environment, persist indefinitely. PCB exposure has been linked to many serious health effects, so much so that the federal government in 1977 banned PCB production. The federal government and the states have spent enormous sums cleaning up PCB environmental contamination. The State of Delaware is no exception.

The State alleged that Monsanto knew that the PCBs it produced and sold to industry and to consumers would eventually be released into the environment and would cause lasting damage to public health and the State's lands and waters. The State brought this action to hold Monsanto responsible for its cleanup costs. It asserted claims for public nuisance, trespass, and unjust enrichment.

The Superior Court dismissed the complaint. The trial court reasoned that, even though the State alleged that Monsanto knew for decades that PCBs were toxic and would contaminate the environment for generations, the State could not assert a public nuisance claim or trespass claim because Monsanto manufactured PCB products, which entered the environment after sale to third parties. The court also found that the State did not have standing to bring a trespass claim because it held public lands in trust rather than outright and therefore did not have the exclusive

3

possession of land needed to assert a trespass claim. And the court held that the Superior Court lacked subject matter jurisdiction to hear the unjust enrichment claim as a standalone claim. It also concluded that the State could not use an unjust enrichment claim to recover future cleanup costs.

On appeal, the State argues that there is no product-based exclusion or control element of a public nuisance or trespass claim. According to the State, it is enough to allege that Monsanto substantially contributed to causing the public nuisance and trespass by selling PCBs to others knowing their end use would cause widespread and lasting environmental contamination. In addition, for its trespass claim, the State contends that it has exclusive possession of lands it owns directly and of lands it holds in trust and thus has standing to assert the claim. Finally, the State argues that it need not demonstrate the lack of a remedy at law for the Superior Court to have jurisdiction to hear its unjust enrichment claim, and it sufficiently alleged how Monsanto has been unjustly enriched.

The Superior Court held correctly that the State lacks standing to pursue a trespass claim for land it holds in trust because it does not have exclusive possession of those lands. And while the Superior Court does have jurisdiction to consider an unjust enrichment claim, we agree with the court that the State cannot assert the claim to recover PCB cleanup expenses because Monsanto did not owe a legal duty independent of its public nuisance and trespass claims.

4

However, we disagree with several of the Superior Court's rulings. First, whether a product is involved, and whether there is control of the product once sold, are not elements of an environmental-based public nuisance or trespass claim under Delaware law. For environmental public nuisance and trespass claims, the question is whether the defendant participated to a substantial extent in carrying out the activity that created the public nuisance or caused the trespass. Here, the State has pled sufficiently that, even though Monsanto did not control the PCBs after sale, it substantially participated in creating the public nuisance and causing the trespass by actively misleading the public and continuing to supply PCBs to industry and consumers knowing that PCBs were hazardous, would escape into the environment after sale to third parties, and would lead to widespread and lasting contamination of Delaware's lands and waters. Second, the State alleged that it owns some land directly – not in trust – and therefore has the exclusive possession of that land needed to assert a trespass claim. Thus, we affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

## I.

### A.

At this stage of the litigation, we accept the well-pled allegations of the complaint as true.[2] In 1929, Swann Research, Inc. began commercial production of

---

[2] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

PCBs in the United States.[3]  Six years later, Monsanto purchased Swann Research. From 1930 to 1977, Monsanto was the only manufacturer of PCBs for widespread commercial use in the United States.[4]

PCBs are a group of synthetic chemical compounds with unique qualities that make them useful in commercial products.[5]  They are fire resistant, minimally water soluble, chemically stable, and have excellent dielectric properties.[6]  They can persist in the natural environment for centuries.  But human exposure to PCBs "can cause serious liver damage, depressed immune system function, skin conditions such as acne and rashes, significant irritation of and harm to the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, depression, fatigue, and learning capacity impairment."[7]  In children, PCBs can alter their development, and exposure can happen prenatally or through breast milk.[8]  The Environmental Protection Agency (the "EPA") declared PCBs as probable carcinogens.  PCBs also have harmful non-carcinogenic effects on the immune, reproductive, nervous, and endocrine systems of humans.[9]

---

[3] App. to Opening Br. at A022 (the complaint).
[4] *Id.*
[5] *Id.* at A018-19.
[6] *Id.* A020.
[7] *Id*.
[8] *Id*. at A021.
[9] *Id*.

PCBs are harmful to animals, including fish, mammals, pinnipeds, and birds. In animals, PCBs "accumulate in lipid rich tissues and substances, such as the fatty tissues of wildlife, birds, fish, and other animal life."[10] One study found a correlation between PCB exposure and a decline in population and reproduction impairment in minks and certain bird species.[11] Once PCBs enter the environment, they "are transported through soil, sediment, air, and water," and humans and animals are exposed to PCBs through ingestion, inhalation, or direct contact.[12]

## B.

According to the complaint, Monsanto knew since 1937 about the negative effects of PCBs. That year, it circulated an internal memorandum that explained the toxic effects PCBs had on humans and animals.[13] Yet, it continued to "develop[], produce[], and market[] PCBs for use in a wide range of commercial and industrial applications," without warning to the public.[14] Monsanto manufactured a total of 641,246 metric tons of PCBs in the United States between 1930 and 1977.[15]

PCBs "were advertised and predominantly used as components of dielectric fluids—materials used for electrical insulation—in capacitors, transformers, and

---

[10] *Id.* at A020.
[11] *Id.* at A022.
[12] *Id.* at A026.
[13] *Id.* at A027.
[14] *Id.* at A023.
[15] *Id.*

other electrical systems."[16] PCBs entered the environment through the use in both open and closed products. In "open applications" – coolants, flame retardants, plasticizers, paint, etc. – PCBs entered the environment through usage.[17] Closed applications emitted PCBs through "leaks, maintenance, or by volatilizing into the air."[18]

Monsanto knew as early as the 1950s that PCBs escaped into the environment.[19] In the 1950's and 60's, scientists reported on the widespread and harmful effects of PCBs. But Monsanto "repeatedly misrepresented those facts, telling consumers, the public, and government entities the exact opposite—that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner."[20]

In 1947, in response to a customer's inquiry about the hazards of PCBs, Monsanto told the customer that Aroclor 1268, one of its PCB products, was almost non-toxic, "but '[t]he vapors of other Aroclors studied are toxic and should be avoided.'"[21] In 1949, it created its own statement regarding the risks of PCBs to distribute to inquiring clients and customers:

> TOXICITY—Prolonged exposure to AROCLOR vapours will lead to systemic toxic effects. However, this is not significant except at high

---

[16] *Id.*
[17] *Id.* at A023-24.
[18] *Id.* at A024.
[19] *Id.* at A031.
[20] *Id.* at A043.
[21] *Id.* at A028 (alteration in original).

temperatures and then normal draught ventilation will remove any risk. [] Acne-form skin eruptions may arise from continued bodily contact with liquid AROCLORS, but normal precautions and, if necessary, suitable garments provide adequate protection. Toxic effects will follow considerable oral ingestion, but this hazard is unlikely to be encountered.[22]

In March 1969, Monsanto wrote the Los Angeles County Air Pollution Control District and advised that "the Aroclor compounds 'are not particularly toxic by oral ingestion or skin absorption.'"[23] Later in that same year, it told the New Jersey Department of Conservation that "[b]ased on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[24] It also tried to persuade the U.S. Navy to use PCBs in its submarines after the Navy conducted its own independent research and concluded that PCBs were too dangerous to use.[25]

In the 1960s, Monsanto promoted and marketed the use of PCBs in a wide variety of common household items, although Monsanto tried to distance itself from the use of PCBs in household items by 1970.[26] In a press release Monsanto stated that "PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors. It is also used in commercial heating and cooling systems. It is not a 'household' item."[27] At the time, however, Monsanto

---

[22] *Id.*
[23] *Id.* at A043.
[24] *Id.* at A044 (alteration in original).
[25] *Id.* at A030.
[26] *Id.* at A042-43.
[27] *Id.* at A043.

was still marketing and selling PCB compounds for use in common household items.[28]

Monsanto's representations about the relative safety of PCBs were inconsistent with the evidence in its possession. In 1953, Monsanto's manager of environmental health sent an internal memorandum to its chief chemist, noting that PCBs could not be considered nontoxic. In another internal report two years later, its chief chemist attached to the report an article that stated that the toxicity of PCBs had been repeatedly demonstrated.[29] Monsanto also ignored its own research in 1966 that "demonstrated the seemingly limitless potential of PCBs for environmental destruction."[30]

In 1969, when the toxicity evidence became overwhelming, Monsanto "formed an 'Aroclor Ad Hoc Committee,' and tasked that committee with preparing recommendations for actions that Monsanto could take to improve its reputation and salvage its bottom line."[31] The committee reported two key findings:

> The committee believes there is little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated—e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.

---

[28] *Id.*
[29] *Id.* at A029.
[30] *Id.* at A034.
[31] *Id.* at A037.

Secondly, the committee believes that there is no practical course of action that can so effectively police the uses of these products as to prevent environmental contamination. There are, however, a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.[32]

In response to the committee's findings, in 1970, Monsanto circulated an interoffice memorandum and updated its previous customer statements from 1947. In the memorandum, Monsanto acknowledged the harmful effects of PCBs but reiterated that Monsanto would continue to make PCBs because "[w]e can't afford to lose one dollar of business."[33] The memorandum "provided talking points for [Monsanto's] employees when discussing the dangers of PCBs with inquiring customers."[34] Monsanto instructed employees "to avoid any situation where a customer wants to return fluid."[35] In the year following the Ad Hoc Committee formation and circulation of the memorandum, Monsanto's PCB production reached a company-high of 85 million pounds.[36]

Monsanto continued to sell PCBs until 1977, when the federal government prohibited their manufacture and sale.[37]

---

[32] *Id.* at A038 (emphasis omitted).
[33] *Id.* at A040 (alteration in original).
[34] *Id.*
[35] *Id.*
[36] *Id.* at A040-41.
[37] *Id.* at A014.

11

C.

Even though PCB production ceased in 1977, PCBs continue to contaminate the natural environment. Delaware in particular has "investigated, monitored, and detected the presence of PCBs on its lands, in its waters, and in various wildlife species and other public trust resources within its borders."[38] PCBs have been detected in the Delaware River, Delaware Bay, Christina River, a variety of privately-owned contaminated sites located within the State, the Amtrak rail yards, CitiSteel, Governor Bacon Health Center/Fort DuPont State Park,[39] and other State-owned lands and public trust resources. The State has "develop[ed] innovative clean-up strategies, including deploying PCB-destroying microorganisms and adding activated carbon and quicklime to sediments that bind contaminants and limit their transfer to the water and fish."[40]

D.

Against this backdrop, on September 22, 2021, the State of Delaware became the latest of many states to file suit against Monsanto to recover damages for harm

---

[38] *Id.* A046 (the complaint).
[39] As alleged, the State-owned land is "located on the grounds of a former military base dating back to the Civil War, which was sold to the State in 1947. Near the health center and the state park is a former landfill in which PCB-containing materials were deposited. Both state and federal agencies have undertaken cleanup, with the EPA removing PCB-contaminated soil from the area and DNREC performing treatment to eliminate hazardous runoff from the site." *Id.* at A055.
[40] *Id.* at A058.

12

suffered due to the manufacturing of PCBs.[41]  The State asserted three claims –
public nuisance, trespass, and unjust enrichment.

For its public nuisance claim, the State alleged that the "continuous presence
of PCBs on lands and in waters that the State owns or holds in trust . . . presents
ongoing risks to the health of humans, fish, wildlife, and the environment in the State
of Delaware and constitutes an unreasonable interference with rights common to the
general public."[42]  For the trespass claim, it alleged that the presence of PCBs "on
or in waters, land, and other public trust resources of the State interferes with the
State's interest in the exclusive possession of that property and thereby constitutes a
trespass."[43]  It also alleged that Monsanto "had no license or other authorization to
enter onto or leave contaminants on property that the State possesses."[44]  For the
unjust enrichment claim, the State alleged that it had incurred significant
investigation, monitoring, and remedial costs in abating the hazard and the risk PCBs
pose to public health and safety.

For all claims, the State alleged that Monsanto knew as early as 1937 of the
hazardous effects of PCBs in the environment but ignored the evidence and took

---

[41] Around 1977, Monsanto restructured into three separate entities: Monsanto Company, Solutia,
Inc., and Pharmacia LLC.  Monsanto now "operates Original Monsanto's agricultural products
business."  *Id.* at A015.  Solutia "has assumed all operations, assets, and liabilities of [Original
Monsanto's chemical products] business."  *Id.*  Pharmacia "operates Original Monsanto's
pharmaceutical business."  *Id.*
[42] *Id.* at A058-59 (the complaint).
[43] *Id.* at A061.
[44] *Id.*

13

steps to actively mislead the public. The State sought damages for the harm caused by PCBs and the cost to abate PCB contamination from its lands, waters, and natural resources.

E.

The Superior Court granted Monsanto's motion to dismiss the complaint.[45] The court found that Delaware does not recognize product-based public nuisance claims, and that Monsanto could not be liable for environmental contamination under public nuisance and trespass because it did not exercise control over the PCBs once sold to third parties. For the trespass claim, the court found that the State did not have standing. As the court reasoned, although the State had regulatory control over the land and resources, the State does not have exclusive possession of lands and waters it holds in trust for Delaware citizens. Finally, the court dismissed the State's unjust enrichment claim because it lacked jurisdiction to hear unjust enrichment as a standalone legal claim. It also concluded that an unjust enrichment claim does not extend to future obligations, which in this case arose after 1977 when the federal government banned the manufacture and sale of PCBs.

II.

Nuisance and trespass are related torts. In the land use context, a nuisance interferes with a plaintiff's use and enjoyment of property while a trespass interferes

---

[45] *State ex rel. Jennings v. Monsanto Co.*, 2022 WL 2663220 (Del. Super. July 11, 2022).

with a plaintiff's exclusive possession of property.[46] Nuisance is further divided into private and public nuisance. A private nuisance is, like the name suggests, an unreasonable interference with a private right.[47] A public nuisance is "an unreasonable interference with a right common to the general public."[48] Nuisance claims overlap with trespass claims when the trespasser physically enters a property and, while on the property, engages in activity that affects the possessor's use and enjoyment of that property.[49]

Monsanto does not challenge the State's standing to bring a public nuisance claim for the release of PCBs onto Delaware's lands and into its waters. Also, it does not contest the sufficiency of the State's pleading that the discharge of PCBs onto Delaware's lands and into its waters is an unreasonable interference with a right common to the general public and therefore is a public nuisance. There is no dispute that these circumstances would be sufficient to support a claim of public nuisance were it alleged that Monsanto dumped PCBs onto State lands and into State waterways directly. But that is not what happened here. Rather, Monsanto

---

[46] Page Keeton, *Trespass, Nuisance, and Strict Liability*, 59 Colum. L. Rev. 457, 464-66 (1959).
[47] *Patton v. Simone*, 626 A.2d 844, 855 n.8 (Del. Super. 1992) (quoting Restatement (Second) of Torts § 821D (1979)).
[48] *Id.* (quoting Restatement (Second) of Torts § 821B).
[49] Restatement (Second) Torts § 821D cmt. e ("[I]nvasion of the possession of land normally involves some degree of interference with its use and enjoyment and this is true particularly when some harm is inflicted upon the land itself.").

15

manufactured PCBs and sold them to third parties before the PCBs entered the environment.

Focusing on Monsanto's status as a manufacturer, the Superior Court held that Monsanto can avoid addressing the harm caused by its product to a public right because under Delaware law "product claims are not encompassed within the public nuisance doctrine," and "[Monsanto] is not liable for public nuisance unless it exercises control over the instrumentality that caused the nuisance at the time of the nuisance."[50]  The State responds that the trial court erred in both findings, because Delaware law does not categorically bar product-based public nuisance claims and does not impose control as a separate element of a public nuisance claim.

On appeal we review *de novo* the Superior Court's dismissal of a complaint under Superior Court Civil Rule 12(b)(6).[51]  Like the Superior Court, the Supreme Court must accept as true all well-pled factual allegations that provide the opposing party notice of the claim, draw all reasonable inferences in favor of the plaintiff, and determine whether the plaintiff would be entitled to recovery "under any reasonably conceivable set of circumstances."[52]

---

[50] *State ex rel. Jennings*, 2022 WL 2663220, at *2-*4.
[51] *Central Mortg. Co.,* 27 A.3d at 535.
[52] *Id.*

## A.

Delaware courts have applied the common-sense notion that public nuisance liability extends not just to those who own the land, but also to those who substantially participate in creating the public nuisance. For instance, in *Keeley v. Manor Park Apts., Sec. 1, Inc*,[53] the plaintiff landowner sued for a drainage problem emanating from an adjoining subdivision. Two of the defendants moved for summary judgment and claimed that, after they sold the subdivision, "they did not construct or aid in the construction of the streets, spillway and underground conduits, and were not legally responsible for any damage to plaintiffs arising therefrom."[54]

The court noted that "[o]ne who erects a nuisance will sometimes be liable for its continuance after he has parted with the possession of the land, particularly where he conveys the property with covenants for the continuance of the nuisance or otherwise derives benefit therefrom."[55] Further, according to the court, "[a]ll those who participate in the creation or maintenance of a nuisance are generally liable to third persons for injuries suffered therefrom."[56] The court denied the defendants summary judgment on the nuisance claim based on disputed issues of material fact about their contribution to the nuisance. It found that, in addition to the fact that the

---

[53] 99 A.2d 248 (Del. Ch. 1953).
[54] *Id*. at 249.
[55] *Id*. at 250.
[56] *Id*.

defendants were the original owners of the tract, they designed the lots and the streets and their grades. They also supervised conduit placement and reserved the right to use it themselves.

Another decision illustrating this common-sense approach came thirty-two years later, in *Hazlett v. Fletcher*.[57] The defendants no longer owned or controlled the property creating the nuisance. Relying on the Restatement (Second) of Torts, the Court of Chancery refused to dismiss a nuisance claim. It reasoned that "where a person participates to a substantial degree in creating a physical condition that is, itself, harmful after the activity that created it has ceased, such person generally will be subject to continuing liability for future harm."[58] Whether the defendants substantially participated in the creation of the nuisance was a question that could not be resolved on a motion to dismiss.[59]

Although the Court of Chancery's *Keeley* and *Hazlett* decisions show that there is no "product based" or "control" exception to nuisance claims under Delaware law, the Superior Court drew primarily from *Sills v. Smith & Wesson*

---

[57] 1985 WL 149636, at *2 (Del. Ch. Mar. 1, 1985).
[58] *Id.*
[59] *Id.* More recently, in *Robinson v. Oakwood Vill., LLC*, 2017 WL 1548549 (Del. Ch. Apr. 28, 2017), the Court of Chancery entered judgment following trial in favor of the defendants because they did not own or control the property. But the court distinguished *Keely* and *Hazlett* by noting that "insufficient evidence [existed] on which to extend liability beyond the fee owner during the periods relevant to trespass and nuisance liability." *Id.* at *16 n.219.

18

*Corp.*,[60] *State ex rel. Jennings v. Purdue Pharma L.P.*,[61] and *Patton v. Simone*.[62]

*Sills* involved negligence and public nuisance claims brought by the City of Wilmington against gun manufacturers and others stemming from gun violence in Wilmington. The court observed that Delaware law includes "no express authority [] requiring public nuisance claims be restricted to those based on land use," but the court also stated without a supporting citation that "Delaware courts remain hesitant to expand public nuisance" to include product-based claims.[63] The court ultimately avoided the issue, holding that the City failed to state an "independent claim for public nuisance" because the public nuisance claims were subsumed in the City's negligence claims.[64]

*Purdue Pharma* involved public nuisance claims brought by the State against opioid manufacturers, distributors, and pharmacies stemming from the opioid epidemic. The Superior Court dismissed the State's claims and held that "[a] defendant is not liable for public nuisance unless it exercises control over the instrumentality that caused the nuisance at the time of the nuisance."[65] In reaching this conclusion, the court relied foremost on the *Sills* court's description of Delaware courts as "hesitant" to recognize product-based public nuisance claims. The court

---

[60] 2000 WL 33113806 (Del. Super. Dec. 1, 2000).
[61] 2019 WL 446382 (Del. Super. Feb. 4, 2019).
[62] 1992 WL 398478 (Del. Super. Dec. 14, 1992); 1992 WL 183064 (Del. Super. June 25, 1992).
[63] *Sills*, 2000 WL 33113806, at *7.
[64] *Id.*
[65] *Purdue Pharma*, 2019 WL 446382, at *13.

also relied on *Patton*, where the court held in early summary judgment decisions that one must own or control the property to be liable for public nuisance.[66] But in a later decision in the same series of cases, the *Patton* court ruled consistent with Delaware's substantial-participation approach that a defendant "would not be liable as it did not carry on the activity which created the nuisance nor *assist in carrying it out*."[67]

B.

After reviewing the Restatement and the Delaware cases, we conclude that the State has stated a claim for public nuisance. At the outset, we are not persuaded, as the Superior Court found, that "product claims are not encompassed within the public nuisance doctrine."[68] The most that can be gleaned from *Sills* and *Purdue Pharma* is that the statement in both cases about a "hesitancy" to recognize product-based public nuisance claims was unsupported. In *Patton*, the court specifically recognized that those who assist in carrying on a nuisance can be liable for nuisance.[69] Further, historical examples abound of products that were held to create

---

[66] 1992 WL 398478, at *9; 1992 WL 183064, at *13.
[67] 1993 WL 54462, at *13 (Del. Super. Jan. 28, 1993) (emphasis added).
[68] *State ex rel. Jennings*, 2022 WL 2663220, at *4.
[69] 1993 WL 54462, at *13.

20

a public nuisance.[70]  Those same cases do not support the notion that a defendant must have "control of its product at the time of the alleged nuisance."[71]

The issue, therefore, is not whether a product is involved or whether the defendant exercised control of the product at the time of the alleged nuisance. Instead, the crux of the issue is: can a product manufacturer be held liable after a product it manufactures is sold to third parties whose activities release the product into the environment and cause a public nuisance?  For the environmental-based public nuisance claim before us, Monsanto can be held liable when it substantially contributed to a public nuisance by misleading the public and selling a product it knew would eventually cause a safety hazard and end up contaminating the environment for generations when used by industry and consumers.

First, under the Restatement (Second) of Torts, a nuisance causing activity includes "all acts that are a cause of harm."[72]  The Second Restatement also provides that a defendant is liable for nuisance "not only when he carries on the activity but

---

[70] Examples of product-based public nuisance in the Second Restatement include explosives and fireworks.  Restatement (Second) of Torts § 821B cmt. b.  *See also* Leslie Kendrick, *The Perils and Promise of Public Nuisance*, 132 Yale L.J. 702, 738-39 (2023) ("[W]ritings such as Sheppard's and Blackstone's give the lie to the common assertion . . . that public nuisance pertained only to the use of the land.  Several of Sheppard's and Blackstone's examples are not land-based, including setting off fireworks, being an eavesdropper, and being a common scold[,] [a]nd . . . 'victuallers, butchers, bakers, cooks, brewers, maltsters and apothecaries who sell *products* unfit for human consumption.'") (internal footnotes omitted); *Craven v. Fifth Ward Republican Club, Inc.*, 146 A.2d 400 (Del. Ch. 1958) (entering a preliminary restraining order to enjoin, as a public nuisance, the illegal sale of alcohol).
[71] Answering Br. at 4.
[72] Restatement (Second) of Torts § 834 cmt. b.

21

also when he participates to a substantial extent in carrying it on."[73]  As alleged in the complaint, continuing to supply PCBs, which were known to be toxic to humans and wildlife, to industry and to consumers, knowing PCBs would escape and permanently contaminate Delaware's lands and waters, and taking affirmative steps to mislead the public and government officials about the safety of PCBs, qualifies as participating to a substantial extent in carrying on a public nuisance.

It bears noting that comment "g" to Section 8 of the Restatement (Third) of Torts states that it excludes from economic loss nuisance liability for products like handguns, opioids, and tobacco.[74]  This decision does not reach the question whether Delaware law categorically forecloses nuisance claims against manufacturers of products like handguns, opioids, and tobacco for harms caused by those products to a public right.  It is sufficient for present purposes to say that comment "g" does not

---

[73] *Id*. § 834.  The Delaware courts generally consider the Restatement persuasive authority.  *See Fox v. Fox*, 729 A.2d 825, 828-29 (Del. 1999) (explaining that "[w]e find [the Restatement (second)] . . . not only persuasive but promotive of humanitarian goals"); *Estate of Tigani*, 2016 WL 593169, *18 (Del. Ch. Feb. 12, 2016) (recognizing that "Delaware courts generally find the Restatement of Laws to be persuasive authority on many topics"); *Stayton v. Delaware Health Corp.*, 117 A.3d 521, 533-34 (Del. 2015) (explaining that "Delaware has followed the Restatement (Second) of Torts in its application of the collateral source rule"); *In re Peierls Family Inter Vivos Trusts*, 77 A.3d 249, 255 (Del. 2013) (explaining that "[w]hen confronted with a choice-of-law issue, Delaware courts adhere to the Restatement (Second) of Conflict of Laws"); *Falconi v. Coombs & Coombs, Inc.*, 902 A.2d 1094, 1099 (Del. 2006) (explaining that "[i]n the context of determining vicarious liability for a tort, this Court has recognized the value of the Restatement (Second) of Agency as an aid in deciding whether an individual is an employee or independent contractor").

[74] Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020).

target products like PCBs that cause environmental harm, as reflected in comment "a" to that same Section:

> [t]his Section addresses the liability in tort of a defendant who creates a public nuisance that results in economic loss to the plaintiff. This Section does not seek to restate the substantive law of public nuisance except as necessary to explain those cases that produce liability in tort for economic loss alone. Many public nuisances are not of that character; they cause physical harm, as when a defendant negligently leaves an obstruction in a road and the plaintiff collides with it, or as when a defendant's pollution causes damage to property that the plaintiff owns. Those cases are outside the scope of this Section.[75]

The comments to Restatement (Third) of Torts confirm that, for purposes of public nuisance, products like handguns, opioids, and cigarettes are not the same as products like PCBs that cause environmental harm to property and economic loss to the plaintiff.

Second, as noted earlier, Delaware courts have historically taken a common-sense approach to the issue. In the *Keeley* and *Hazlett* cases, the trial court recognized that, even when the defendant is not a property owner causing the nuisance, "where a person participates to a substantial degree in creating a physical condition that is, itself, harmful after the activity that created it has ceased, such person generally will be subject to continuing liability for future harm."[76] It is reasonably conceivable that Monsanto substantially participated in creating the

---

[75] *Id*. § 8 cmt. a.
[76] *Hazlett*, 1985 WL 149636, at *2.

23

public nuisance by selling PCBs to industry and to consumers knowing PCBs would escape in the environment and contaminate the State's lands and waters for generations.

Third, the State joins a long line of government plaintiffs throughout the country to assert public nuisance cases against Monsanto for PCB environmental contamination, and our view is consistent with almost all those cases. As those courts found, the complaints alleged that Monsanto substantially contributed to a public nuisance because it knew for some time that PCBs would cause long-lasting environmental harm when used by third parties and hid those dangers from the public until forced to cease production.[77]

---

[77] All but one of the Monsanto PCB cases in other jurisdictions survived motion to dismiss on the public nuisance claim. *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 541 (S.D.N.Y. 2007) (denying Monsanto's motion to dismiss because the plaintiffs sufficiently pled that Monsanto substantially participated in creating the nuisance by alleging that Monsanto manufactured and sold the PCBs to General Electric Company and concealed the dangers of PCBs from General Electric Company); *City of Spokane v. Monsanto Co.*, 2016 WL 6275164, at *8 (E.D. Wa. Oct. 26, 2016) (denying Monsanto's motion to dismiss because the plaintiff alleged that the PCBs migrated into the river even when, and regardless of whether, products containing PCBs were used or disposed of as intended (widespread use), and Monsanto knew that widespread use of the PCBs it manufactured was contaminating the environment); *City of San Jose v. Monsanto Co.*, 231 F. Supp. 3d 357, 363 (N.D. Cal. 2017) (denying Monsanto's motion to dismiss because the plaintiff sufficiently pled that "Monsanto knew that PCBs were dangerous, concealed that knowledge, promoted the use of PCBs in a range of applications, and gave disposal instructions that were likely to cause environmental contamination"); *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1106–07 (W.D. Wash. 2017) (denying Monsanto's motion to dismiss because the plaintiff adequately pled that Monsanto was the sole PCB producer, Monsanto promoted PCBs across many different uses/markets, PCBs were the most widespread contaminant in the river, Monsanto knew PCBs were dangerous, and Monsanto was on notice in 1960s that PCBs were uncontrollable pollutants that endangered the environment as a result of their normal and intended use); *Port of Portland v. Monsanto Co.*, 2017 WL 4236561, at *9 (D. Or. Sept. 22, 2017) (denying Monsanto's motion to dismiss because the parties did not sufficiently brief the issue of "whether a plaintiff can

For instance, in *Mayor & City Council of Baltimore v. Monsanto Co.*, the Maryland District Court denied Monsanto's motion to dismiss because the City of Baltimore "sufficiently alleged that [Monsanto] created or substantially participated in the creation of PCBs, even though Defendants may not have maintained control over the contaminants once disseminated in the City's waters."[78]  The court relied on the allegations that "Monsanto manufactured, distributed, marketed, and promoted PCBs, resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the City's stormwater and other water systems

bring a public nuisance claim for damages when the claim overlaps with a product liability claim"); *City of Long Beach v. Monsanto Co.*, 2018 WL 4846657 (C.D. Cal. Aug. 21, 2018) (denying Monsanto's motion to dismiss on other grounds not relevant to this case); *County of Los Angeles v. Monsanto Co.*, 2019 WL 13064885, at *10 (C.D. Cal. Nov. 21, 2019) (denying Monsanto's motion to dismiss because the plaintiffs sufficiently pled that "[Monsanto] knew that PCBs were toxic as early as the 1930s, and certainly by the 1950s . . . [but] continued to promote the use of PCBs in a wide variety of products and downplay the danger of PCBs . . . and instructed its customers to dispose of PCB containing wastes in local landfills, knowing that landfills were not suitable for PCB-contaminated waste"); *Mayor of Baltimore v. Monsanto Co.*, 2020 WL 1529014, at *10 (D. Md. Mar. 31, 2020) (denying Monsanto's motion to dismiss because the plaintiff adequately alleged that Monsanto created or substantially participated in the creation of the PCBs, knew about PCBs' harmful effects, intentionally withheld that information and misrepresented to the public and government officials that PCBs were safe, and manufactured and distributed PCBs that ended up in Baltimore's waters, causing harm to humans, animals, and environment); *Illinois ex rel. Raoul v. Monsanto Co.*, 2023 WL 3292591, at *3 (N.D. Ill. May 5, 2023) (denying Monsanto's motion to dismiss because Monsanto created or participated in the creation of the nuisance by selling PCBs even though it knew PCBs would  "inevitably leach into and pollute the State's natural resources even in the absence of any negligence on the part of the buyer"); *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 652 (Pa. Commw. Ct. 2021) (denying Monsanto's motion to dismiss because "Plaintiffs clearly declare that [Monsanto] [is] responsible for PCBs entering the Commonwealth's waters because [Monsanto] knew that the uses for which they marketed, sold, and distributed PCB mixtures would result in leaching, leaking, and escaping their intended applications and contaminating (i.e., polluting) those waters"); *but see Town of Westport v. Monsanto Co.*, 2015 WL 1321466, at *4 (D. Mass. Mar. 24, 2015) (granting Monsanto's motion to dismiss because Monsanto did not have control of the PCB containing products).
[78] 2020 WL 1529014, at *10.

and waters."[79]  It noted further that Monsanto had knowledge of the harmful effects of PCBs and intentionally withheld that information and made misrepresentations to the public and government officials.

Here, the State has pled sufficiently that Monsanto, as the sole PCB producer, substantially participated in the creation of the public nuisance.  It alleged that Monsanto knew early on about the dangers of PCBs.  In 1937, an internal memorandum reported that "[e]xperimental work in animals show[ed] that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects."[80]  The next year, a Harvard professor presented her findings to Monsanto on the toxic effects of PCBs.  In 1953, Monsanto's manager of environmental health drafted an internal memorandum that advised that PCBs could not be considered nontoxic.[81]  Two years later, its chief chemist circulated internally an article that reported on the toxicity of PCBs.[82]  In addition to these internal communications, "[t]hroughout the 1940s and 1950s, scientists continued to report to Monsanto on the widespread, harmful effects of PCBs."[83]

---

[79] *Id.*
[80] App. to Opening Br. at A027.
[81] *Id*. at A028.
[82] *Id*. at A029.
[83] *Id*. at A031.

According to the allegations of the complaint, knowing this information, Monsanto took affirmative steps to conceal the toxic nature of PCBs and spread misinformation about PCBs negative health effects. Beginning with its own customers, in 1947, it told an inquiring customer that one of its PCB mixtures was safe and almost non-toxic.[84] It instructed employees to tell customers that systemic toxic effects were not significant.[85] Its misrepresentations did not stop with customers. In 1957, the U.S. Navy refused to use PCBs in its submarines after it conducted an independent test that revealed the toxic nature of PCBs.[86] Monsanto nevertheless attempted to change the Navy's mind.

In 1969, Monsanto also wrote the Los Angeles Air Pollution Control District and advised it that PCBs were not toxic either by oral ingestion or skin absorption.[87] It sent a similar letter to the Regional Water Quality Control Board denying any special health or environmental problems linked with PCBs.[88] Later that year, it made similar misrepresentations to the National Air Pollution Control Administration and stated that it could not "conceive how the PCBs can be getting into the environment in a widespread fashion."[89]

---

[84] *Id*. at A028.
[85] *Id*.
[86] *Id*. at A030.
[87] *Id*. at A043-44.
[88] *Id*. at A044.
[89] *Id*.

Monsanto also used a misleading advertisement to conceal the toxic nature of PCBs. In a 1961 brochure, Monsanto promoted PCBs as being widely used in household items.[90] By 1970, however, it sought to distance itself from its earlier promotion. In a press release, it stated that PCBs were "primarily for use as a coolant in electrical transformers and capacitors . . . [and] not [for use as] a 'household' item."[91] Nevertheless, it continued to market and to sell PCBs for use in household items. Monsanto went as far as establishing a committee and tasking it with "preparing recommendations for actions that Monsanto could take to improve its reputation and salvage its bottom line."[92] One of the recommendations was to beef up the talking points for its employees when discussing the danger of PCBs with customers.

Accepting these allegations as true, as we must at this stage of the proceedings, it is reasonably conceivable that Monsanto substantially participated in the creation of a public nuisance by manufacturing and selling PCBs that it sold to industry and consumers and knew PCBs would eventually end up causing long lasting contamination to state lands and waters.

---

[90] *Id* at A042.
[91] *Id.* at A043.
[92] *Id.* at A037.

28

## III.

Turning to the State's trespass claim, the Restatement (Second) of Torts provides:

> [o]ne is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
> (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
> (b) remains on the land, or
> (c) fails to remove from the land a thing which he is under a duty to remove.[93]

The Superior Court dismissed the State's trespass claim on two grounds: first, the State did not have exclusive possession of lands it holds in public trust; and second, Monsanto did not control the PCBs trespassing on the State's land.

On appeal, the State argues that it has exclusive possession of land it holds directly and also in public trust because the State has the right to exclude unwanted persons or objects. And it contends that the disposition of the control issue for public nuisance dictates the result for its trespass claim.

---

[93] Restatement (Second) of Torts § 158 (1965). *See Amer v. NVF Co.*, 1994 WL 279981, *3 (Del. Ch. June 15, 1994) (citing Restatement (Second) of Torts § 158 (1965)) ("A prima facie case of trespass is established when plaintiff shows that defendant intentionally and without consent entered onto real property belonging to the plaintiff.").

29

A.

Subaqueous lands are held by the State in trust for the public.[94] Section 157 of the Restatement (Second) of Torts defines possession, for the purposes of trespass, as one who:

> (a) is in occupancy of land with intent to control it, or (b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or (c) has the right as against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).[95]

The Second Restatement defines "occupancy" as "acts done upon the land as manifest a claim of *exclusive control* of the land, and indicate to the public that he who has done them has appropriated it."[96] The Second Restatement also states that "[t]he word 'intrusion' is used throughout the Restatement of this Subject to denote the fact that the possessor's interest in the *exclusive possession* of his land has been invaded by the presence of a person or thing upon it without the possessor's consent."[97] Under Delaware law, "[o]nly a person in possession of the property may allege a trespass action."[98]

---

[94] *See Illinois Cent. R. Co. v. State of Illinois*, 146 U.S. 387, 452 (1892); *Bailey v. Philadelphia, W. & B.R. Co.*, 1846 WL 726, *1 (Del. June 1846).

[95] Restatement (Second) of Torts § 157.

[96] *Id.* § 157 cmt. a (emphasis added).

[97] *Id.* § 158 cmt. c (emphasis added).

[98] *Pilots' Ass'n for Bay & River Delaware v. Lynch*, 1992 WL 390697, *3 (Del. Super. Nov. 19, 1992) (citing *Reed v. Dehorty*, 1804 WL 234 (Del. Com. May 15, 1804)).

Other jurisdictions applying the Second Restatement have found that a state does not have exclusive possession of land it holds in public trust. For example, in *New Jersey Department of Environmental Protection v. Hess Corporation*, the New Jersey Superior Court dismissed a trespass claim brought by the state for environmental contamination of the state's natural resources.[99] It held that "[l]and in the public trust is held by the State on behalf of a second party, the people. Such land cannot be in 'exclusive possession' of the State as the interest created by the doctrine is intended to ensure that others have use of the same land."[100] The Maryland Federal District Court also "dismiss[ed] the State's trespass claim to the extent it [wa]s based on properties outside of its exclusive possession—*i.e.*, its natural waters and the properties of its citizens."[101] Several other jurisdictions, many of whom relied on the Second Restatement, have followed suit.[102]

Here, the State argues that property it holds in trust is in its exclusive possession because it can exclude certain people from the property.[103] But the public trust doctrine significantly limits the State's right to exclude others. At best, the

---

[99] 2020 WL 1683180, *6 (N.J. Super. Ct. App. Div. Apr. 7, 2020).

[100] *Id.* (footnote omitted).

[101] *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 471 (D. Md. 2019).

[102] *See, e.g., New Mexico v. Gen. Elec. Co.*, 467 F.3d 1223, 1247 n.36 (10th Cir. 2006) ("[T]he State as guardian of the public trust has no possessory interest in the sand, gravel, and other minerals that make up the aquifer—a necessary requisite to maintaining a trespass action.").

[103] The State relies on *Kane v. NVR, Inc.*, 2020 WL 3027239 (Del. Ch. June 5, 2020), an order on exceptions to a Master's Report. In *Kane*, however, the court did not discuss the exclusive possession requirement. It simply noted that trespass interferes with the plaintiff's possession of land. *Id.* at * 6.

State shares possession with the public. The State admits that it may only "impair or take away these public rights for *public purposes*."[104] In other words, the State's control over the land is non-exclusive and may at times be subordinate to the public's right to travel, hunt, or fish. We conclude that the State does not have exclusive possession of land it holds in trust. Thus, the Superior Court properly dismissed the State's trespass claim for lands it holds in public trust.[105]

B.

The State also asserts trespass claims for land it holds directly. The parties appear to agree that the State satisfies the exclusive possession requirement for a trespass claim as to those lands. For this category of claims, the parties dispute the Superior Court's holding that a defendant must control the intruding instrumentality at the time of the trespass.

To state a trespass claim against a non-landowner for environmental harm, "[i]t is enough that an act is done with knowledge that it will to a *substantial*

---

[104] Opening Br. at 35 (emphasis added).

[105] Monsanto also argues that the State does not allege damage to its lands. But the failure to allege damages is not fatal to a trespass claim. Under the Restatement (Second) of Torts § 163, "[o]ne who intentionally enters land in the possession of another is subject to liability to the possessor for a trespass, although his presence on the land causes no harm to the land, its possessor, or to any thing or person in whose security the possessor has a legally protected interest." Rather, "[t]he fact that the actor knows that his entry is without the consent of the possessor and without any other privilege to do so, while not necessary to make him liable, may affect the amount of damages recoverable against him, by showing such a complete disregard of the possessor's legally protected interest in the exclusive possession of his land as to justify the imposition of punitive in addition to nominal damages for even a harmless trespass, or in addition to compensatory damages for one which is harmful." *Id.* § 163 cmt. e.

32

*certainty* result in the entry of the foreign matter."[106]  In its complaint, the State identified two State-owned facilities that are located on a former military base the State purchased in 1947.  It also alleged that the facilities are located next to "a former landfill in which PCB-containing materials were deposited" and "[b]oth state and federal agencies have undertaken cleanup, with the EPA removing PCB-contaminated soil from the area and DNREC performing treatment to eliminate hazardous runoff from the site."[107]  It is reasonable to infer from these allegations that the two facilities were contaminated by PCBs emanating from the adjoining landfill.  At least for the military base property, the State has the requisite exclusive possessory interest to assert a trespass claim.  If there are other state-owned properties contaminated by PCBs, on remand the State can amend its complaint to identify those parcels and plead a trespass claim.

While Monsanto might not have owned adjoining land or dumped the PCBs directly onto the State's land, as the only manufacturer of PCBs in the United States, it substantially contributed to the entry onto the State's land by supplying PCBs to Delaware manufacturers and consumers, knowing that their use would eventually trespass onto other lands.  Accepting these allegations as true, the State has pled sufficiently a trespass claim for land it owns directly.

---

[106] Restatement (Second) of Torts § 158 cmt. i (emphasis added).
[107] App. to Opening Br. at A055 (the complaint).

IV.

Finally, the State argues that the court erred on two grounds when it dismissed its unjust enrichment claim: first, the Superior Court did not have jurisdiction to hear an unjust enrichment claim as standalone claim; and, second, the State did not allege that Monsanto was "enriched" by avoiding future PCB cleanup expenses. According to the State, the Superior Court has jurisdiction because unjust enrichment is a legal as opposed to an equitable claim. It also contends that Monsanto was enriched by the State shouldering the burden of PCB cleanup throughout Delaware.

A.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property against the fundamental principles of justice or equity and good conscience."[108] An unjust enrichment claim can be brought as a standalone claim or as a remedy for other claims, like nuisance and trespass.[109]

---

[108] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (quoting 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (1973)); *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (quoting same).

[109] *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022) (quoting Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution* § 4.1(1), at 366 (2d ed. 1993)). *See also* Eric J. Konopka, *Hey, That's Cheating! The Misuse of the Irreparable Injury Rule as a Shortcut to Preclude Unjust-Enrichment Claims*, 114 Colum. L. Rev. 2045, 2054 (2015) ("When discussing restitution and unjust enrichment, many authors refer to the 'substantive' side and the 'remedial' side of the phrase. Substantive unjust enrichment deals with whether, given the facts of the case, the plaintiff can establish a viable unjust-enrichment claim. The remedial component concerns what relief is granted for the violation of the substantive right.").

The Superior Court found that "[u]njust enrichment is an equitable claim" and therefore could not be heard in the Superior Court.[110]  In reaching this conclusion, the trial court applied the holding of two Superior Court decisions that found that unjust enrichment cannot be brought as a standalone claim in Superior Court.[111]  Those decisions, however, reflect the confusion caused by one of the elements of an unjust enrichment claim – the absence of an adequate remedy at law.

As traditionally articulated by Delaware courts, to support a standalone claim for unjust enrichment, a plaintiff must plead: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law.[112]  In *Garfield*, however, Vice Chancellor Laster thoroughly explored the provenance of an unjust enrichment claim.[113]  We need not repeat that detailed analysis here except to say that, as this Court concluded in *Crosse v. BCBSD, Inc.*, unjust enrichment is historically a legal, not an equitable, claim.[114]  The absence of an adequate remedy

---

[110] *State ex rel. Jennings*, 2022 WL 2663220, at *6.
[111] *Purdue Pharma*, 2019 WL 446382, at *14; *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *3-*4 (Del. Super. Nov. 1, 2017).  In *Incyte*, the Superior Court found it did not have jurisdiction over the unjust enrichment claim because the dispute was subject to arbitration.  The quote from the decision that the Superior Court relied on – "unjust enrichment may be considered as part of damages if liability is found but it does not survive as a standalone claim" – referred to the fact that the Delaware Uniform Trade Secrets Act displaced the unjust enrichment claim, and not that the court lacked jurisdiction to hear the claim.  *Id.* at *3.
[112] *Nemec v. Schrader*, 991 A.2d 1120, 1130 (Del. 2010).
[113] *Garfield*, 277 A.3d at 347-51.
[114] 836 A.2d 492, 496-97 (Del. 2003) (explaining that an unjust enrichment claim is an "off-the-contract theory of recovery" and is a legal, not an equitable claim).

35

at law is required only if an unjust enrichment claim is brought in the Court of Chancery and there is no other independent basis for equitable jurisdiction.[115] The Superior Court had jurisdiction to consider the State's standalone unjust enrichment claim.

B.

The Superior Court dismissed the State's unjust enrichment claim on the alternative ground that the State did not plead that Monsanto was enriched. Although the State pled that Monsanto was relieved of paying for cleanup expenses through the State's use of taxpayer money, the court held that "there is no Delaware authority supporting the proposition that relief from future obligations amounts to a claim for unjust enrichment."[116] On appeal the State argues that "Monsanto has been enriched by virtue of being able to walk away from the environmental contamination it created, while the State, and Delawareans, shoulder the burden of cleaning up Monsanto's PCBs throughout Delaware."[117]

Under the Restatement (Third) of Unjust Enrichment and Restitution:

> (1) A person who performs another's duty to a third person or to the public is entitled to restitution from the other as necessary to prevent

---

[115] *Garfield*, 277 A.3d at 351 ("If a plaintiff seeks to pursue a claim for unjust enrichment in the Court of Chancery and has no other basis for equitable jurisdiction, then the plaintiff must establish the absence of a remedy at law to establish equitable jurisdiction. Colloquially speaking, the absence of a remedy at law can be viewed as an element of the claim. Outside of a dispute over jurisdiction, however, it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law.").

[116] *State ex rel. Jennings*, 2022 WL 2663220, at *7.

[117] Opening Br. at 45.

unjust enrichment, if the circumstances justify the decision to intervene without request.

(2) Unrequested intervention may be justified in the following circumstances:

    (a) the claimant may be justified in paying another's money debt if there is no prejudice to the obligor in substituting a liability in restitution for the original obligation;

    (b) the claimant may be justified in performing another's duty to furnish necessaries to a third person, to avoid imminent harm to the interests of the third person; and

    (c) the claimant may be justified in performing another's duty to the public, if performance is urgently required for the protection of public health, safety, or general welfare.

(3) There is no unjust enrichment and no claim in restitution by the rule of this section except insofar as the claimant's intervention has relieved the defendant of an otherwise enforceable obligation.[118]

As the Restatement provides, "unrequested intervention" – which is the case here – does not typically result in an enrichment unless done under subsection (2)(c) to remedy an emergency or under (3) for a pre-existing duty that is not being performed by the defendant. Neither applies here. First, the emergency exception has typically been applied when there is an urgent and immediate need to abate a harm. While few would doubt that PCB contamination is a threat to the public health, the situation here is not emergent in that it is time-sensitive like a tanker truck spilling its contents along the highway that causes immediate environmental

---

[118] Restatement (Third) of Restitution and Unjust Enrichment § 22 (2011).

contamination. PCB environmental contamination is serious but not necessarily time-sensitive; unfortunately, it has persisted for decades.[119]

Second, other than through tort liability, the State has not directed us to "an otherwise enforceable obligation" imposed on Monsanto to pay for the State's remediation efforts. The State cites two cases for the proposition that unjust enrichment claims apply "in the context of a public entity undertaking pollution abatement costs,"[120] but one case involved an explicit statutory duty,[121] and the other did not address whether the claim for unjust enrichment was viewed as a remedy for a tort or a standalone claim.[122] As noted earlier, unjust enrichment can be part of the State's remedy under public nuisance and trespass. As a standalone claim, however, it fails.

V.

We affirm the Superior Court's ruling that the State failed to state a claim for unjust enrichment and for trespass to lands that the State holds in public trust, but

---

[119] *Id.* § 22 cmt. h. *See, e.g.*, *City of Jacksonville v. Sohn*, 616 So. 2d 1173, 1175 (Fla. Dist. Ct. App. 1993) (holding that the City of Jacksonville could not maintain an action for the cost of abating nuisance conditions because "the City has in no way alleged that it was acting under an emergency when it abated the nuisances on appellee's properties"); *Wyandotte Transport Co. v. United States*, 389 U.S. 191, 204 (1967) (holding that "the [relevant] facts surrounding that sinking. . . constitute a classic case in which rapid removal by someone was essential").

[120] Opening Br. at 46.

[121] *See State v. Schenectady Chems., Inc.*, 479 N.Y.S.2d 1010, 1014 (N.Y. App. Div. 1984) (state law imposed a duty upon polluters to abate the pollution).

[122] App. to Opening Br. at A149–50 (*The State of Ohio v. Monsanto Co. et al.*, No. A1801237 (Ohio Com. Pl. Sept. 19, 2018)) (denying Monsanto's motion to dismiss a claim for unjust enrichment where the court had also denied the motion as to the public nuisance and trespass claims).

we reverse its ruling that the State failed to state a claim for public nuisance and for trespass to lands that the State owns directly. The case is remanded to the Superior Court for further proceedings consistent with this opinion.